**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| ERIK FRANKLIN, | : | |
| Plaintiff, | : | |
| | | Case No. 3:09cv00242 |
| vs. | : | |
| | | District Judge Walter Herbert Rice |
| MICHAEL J. ASTRUE, | : | Magistrate Judge Sharon L. Ovington |
| Commissioner of the Social | | |
| Security Administration, | : | |
| Defendant. | : | |

**REPORT AND RECOMMENDATIONS[1]**

**I.     Introduction**

Plaintiff Erik Franklin brings this case challenging the Social Security Administration's denial of his applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI). The denial occurred through the final decision of Administrative Law Judge, Daniel R. Shell, who determined that Plaintiff was not eligible for DIB or SSI because he was not under a "disability" within the meaning of the Social Security Act. (Tr. 5-7, 26-40).

This Court has jurisdiction to review ALJ Shell's non-disability decision. *See* 42 U.S.C. §§405(g), 1383(c)(3).

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #10), the Commissioner's Memorandum in Opposition (Doc. #13), Plaintiff's Reply (Doc. #14), the administrative record, and the record as a whole.

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

Plaintiff seeks an Order reversing the denials of his DIB and SSI applications and remanding this matter to the Social Security Administration for payment of benefits.  Or, at a minimum, Plaintiff seeks an Order remanding this matter to correct certain errors. The Commissioner seeks an Order affirming Administrative Law Judge Shell's non-disability decision.

**II.     Background**

      **A.     Plaintiff's Vocational Profile and Testimony**

Plaintiff filed his DIB and SSI applications on March 16, 2004.  The initial disability reviewers noted that Plaintiff's primary diagnoses consisted of "schizophrenic, paranoia & other psychotic disorders." (Tr. 54-55).  His secondary diagnoses consisted of substance addiction disorder (alcohol) and "other disorders of gastrointestinal system." *Id*.

In his DIB and SSI applications, Plaintiff asserted that his disability prevented him from employment beginning on June 2, 2003.  On that date he was twenty-two years old. Social Security Regulations thus categorized him as a "younger person" for the purpose of resolving his applications.  20 C.F.R. §§404.1563(c), 416.963(c).

Plaintiff graduated from high school.  He attended college on a football scholarship and earned some college credits. (Tr. 557).  His employment history is limited to temporary jobs including, for example, a job as a warehouse worker and a job as a sales clerk. (Tr. 38, 556-57).

Plaintiff's testimony during the administrative hearing – along with much of the information in his medical records – concerns his mental health problems, medical treatment, and medications.  Plaintiff testified during the administrative hearing that he had been unable to work since June 2003 due to "mostly mental" problems.  (Tr. 557-58). When questioned by Administrative Law Judge Shell, Plaintiff answered/testified as follows:

      A.     I just understand that I, that I do have voices going through my head.

> Q. How often do... you hear voices?
>
> A. I'll, I, I quite often hear voices.
>
> Q. Okay.
>
> A. But it's, I quite often hear voices, but it's normally like when I want to say not on my meds, but when I don't –
>
> Q. When you don't take your meds?
>
> A. No. When I don't, because sometimes I, I feel, I don't feel comfortable taking my meds because I see, I see things.

(Tr. 561).

Plaintiff further testified that he was depressed and constantly sad and had "high anxiety." (Tr. 563). He normally did not spend time with other people. And he had trouble concentrating because his mind jumped from one thing to another. *Id*. In a typical day Plaintiff mostly mopes around due to his depression. He tries to get work done around the house, but he explains, "sometimes I just can't, I just can't do it." (Tr. 564). Plaintiff testified that he had not used marijuana since he was last admitted to the hospital in December 2006. *Id.*

### B. Medical Evidence

Some highlights of the medical evidence in the administrative record is warranted. For a more detailed discussion with citations to specific evidence of record, see Doc. #10 at 47-55 and Doc. #13 at 71-76.[2]

Plaintiff's mental health problems first surfaced when he was arrested and apparently charged with disorderly conduct and resisting arrest. *See* Tr. 157. He was found incompetent to stand trial, and on June 12, 2003, he was placed in Twin Valley

---

[2] Citations to page numbers in documents of record refer to the page numbers assigned by the Court's case management electronic case filing system.

Behavioral Healthcare "for restoration to competency."[3]  *Id*.

Plaintiff's court placement in Twin Valley was based on Dr. Kristen Haskins' evaluation of Plaintiff, and her conclusion that he was incompetent to stand trial.  *Id*.  A discharge summary from Twin Valley explains that Dr. Haskins' evaluation indicated Plaintiff "was grossly psychotic.  He showed rocking behavior.  He showed problems with stuttering.  He spoke of problems with depression....  He spoke of hearing voices 'like people playing games with me and I hear somebody say like, 'kill my father.'  They say to kill my father....'"  (Tr. 157).  Dr. Haskins further reported that Plaintiff "spoke of people from Atlanta having followed him to his home in Dayton and they shot a laser beam into his house.  He's concerned that people may be playing with his head and they are planning to harm him."  (Tr. 157).  Upon admission to Twin Valley, Plaintiff'was diagnosed with "Schizophrenia, Undifferentiated Type, Provision, R/O [Rule Out] Mood Disorder, RO substance abuse...."  *Id*.

In October 2003 Plaintiff was discharged from Twin Valley after slightly more than 4 months of psychiatric hospitalization.  *Id*.  The discharge summary explained, "This is a 22-year-old male with a clinical picture consistent with Schizophrenia, Paranoid Type, as well as Polysubstance Abuse and Depressive Disorder NOS [not otherwise specified]....  However, he responded well to treatment.  He achieved a remission of his psychotic symptoms.  He achieved good insight.  He agreed to continue on his medications...."  (Tr. 159).  The discharge summary also reported that he had responded well to treatment for depression and "was not depressed at the time of discharge and denied suicidal thoughts."  (Tr. 159).

Plaintiff's prescription medications at the time of his discharge included on anti-psychotic and anti-depression medications.  (Tr. 159).  His GAF was "50 based on level

---

[3]  Twin Valley Behavioral Healthcare is a regional psychiatric hospital administered by the Ohio Department of Mental Health.  *See* http//:www.mentalhealth.ohio.gov.

4

of functioning. Highest in the past year: Estimated to be 50."[4] (Tr. 160).  A GAF of 50 indicates, "serious symptoms ... or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)...." Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision at p. 34 ("DSM-IV-TR").

A note in the administrative record indicates that in early 2004 Plaintiff faced criminal charges in state court for attempted theft, assault, failure to comply, kidnapping, and felonious assault." (Tr. 401).  On March 29, 2004, he was found not guilty by reason of insanity and placed on conditional release. *Id.*

In early April 2004 Plaintiff suffered but survived a gunshot wound to his abdomen.  His Statement of Errors notes, "The injuries required surgical removal of his left kidney and a partial removal of his pancreas.  He had to have his stomach repaired and he underwent a colectomy with resulting colostomy....  The colostomy was ultimately reversed in October 2004." (Doc. #10 at 4, n.2)(citations omitted).

In May 2004 a psychologist reviewed the administrative file for the Ohio Bureau of Disability Determinations (Ohio BDD). (Tr. 201-13).  The psychologist felt there was insufficient evidence to evaluate Plaintiff's disability claim before February 2004.  The record tends to confirm this because at the time of the psychologist's record review, Twin Valley had not yet submitted its records concerning Plaintiff's hospitalization from June to October 2003. *See* Tr. 56.  The psychologist opined that Plaintiff's mental impairments were severe since February 2004 date but would not be expected to last for 12 months. (Tr. 201). The psychologist noted that while Plaintiff had some control of his psychotic symptoms with medication, the medication side effects included decreased concentration and attention. (Tr. 213).

---

[4] Health care professionals use the "GAF" (Global Assessment of Functioning) scale to assess a person's psychological, social, and occupational functioning on a hypothetical continuum of mental illness.  It is, in general, a snapshot of a person's overall psychological functioning at or near the time of the evaluation. *See Martin v. Commissioner*, 61 Fed.Appx. 191, 194 n.2 (6th Cir. 2003); *see also* Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision at 32-34.

In January 2005 Plaintiff began seeing Sehba N. Siddiqi, M.D. Plaintiff informed Dr. Siddiqi about hearing voices and sleeping poorly. (Tr. 409). Dr. Siddiqi observed that Plaintiff's affect was restricted. *Id*. Dr. Siddiqi continued Plaintiff's medications, including Zyprexa and Wellbutrin. (Tr. 410).

In August 2005 Dr. Siddiqi completed a Department of Education form titled "Loan Discharge Application: Total and Permanent Disability."[5] (Tr. 393). Dr. Siddiqi indicated that Plaintiff should be discharged from his student loans due to his disability, including schizophrenia-paranoid type, noting that this illness "prevent[s] the borrower from being able to work and earn money in any capacity." (Tr. 393).

In April 2005 another psychologist, Dr. Chambly, reviewed the file for the Ohio BDD. (Tr. 271-88). She believed that Plaintiff Franklin had a mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace. Dr. Chambly also noted that Plaintiff had one or two episodes of decompensation. (Tr. 281). She found that moderate limitations in multiple areas with a marked limitation on interacting appropriately with the general public. (Tr. 285-86). According to Dr. Chambly, Plaintiff could perform simple, routine work with no public interaction, noting that he should also avoid prolonged co-worker and supervisor interaction. (Tr. 287). Dr. Chambly wrote, "He is not always med and appointment compliant at this time and he [continues] to use marijuana.... [He] has severe impairment, but obviously, he can function when med compliant using substances may also interfere, but at this time is not the main reason he has worsening of symptoms. DA&A [Drug Addiction & Alcoholism] is not material...." (Tr. 287).

In September 2006 Dr. Siddiqi answered interrogatories concerning Plaintiff's

---

[5] The form indicates that the Department of Education's standard for determining "disability" might be different from standards used under other programs, including those applied to "social service benefits or veterans benefits." (Tr. 393).

6

condition. (Tr. 361-70). Dr. Siddiqi, a Board Certified Psychiatrist, treated Plaintiff from January 31, 2005 to September 2006. He opined that Plaintiff could not sustain the mental demands of work in a competitive job placement due to his impairments. (Tr. 364-70). Specifically, Dr. Siddiqi noted that Plaintiff's mood swings, racing thoughts, poor impulse control, and irritability interfered with his work, his social situations, and his interpersonal relationships. (Tr. 366).

Sometime during the Fall of 2006, Plaintiff apparently stopped taking his medications. On December 26, 2006, his mother took him to the Emergency Department because he had become violent at home and had been hallucinating. (Tr. 486). In the Emergency Department, Plaintiff was "noted to be delusional, gesturing, responding to internal stimuli, and ... hyperreligious." *Id.* His mother indicated that his symptoms had increased over several days. She reported he had been noncompliant with his prescription medications for two months and had been off his medications for two days. (Tr. 487). She indicated that he had stopped taking Seroquel because it made him hungry and angry and caused negative thoughts. *Id.* Plaintiff's admission GAF was 31, which is at the lowest end of the range (31-40) for patients with "Some impairment in reality testing or communication (e.g. speech at times is illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school or family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and unable to work)...." DSM-IV-TR at p.34 (capitalization in original).

Plaintiff was admitted involuntarily and placed on medications, including Risperdal and Cogentin. (Tr. 488). He was diagnosed with "Schizophrenia – paranoid type." (Tr. 486). He was transferred to the Twin Valley for further treatment. On the date of his transfer, Plaintiff's GAF had improved to 40, which is at the upper end of the range (31-40) for patients with "some impairment in reality testing or communication...." DSM-IV-TR at p.34.

Approximately six weeks later, in early February 2007, Plaintiff's thinking was

less disorganized, but he had only a moderate amount of insight.  (Tr. 465).  He was discharged from Twin Valley (Tr. 462); his diagnoses consisted of: Schizoaffective Disorder, Bipolar Type most recent episode mixed, Post Traumatic Stress Disorder, and Cannabis Dependence in partial remission.  (Tr. 468).  His GAF had improved to 60, *id*., referring to "moderate symptoms ... OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-TR at p.34 (capitalization in original).

  In follow up with Dr. Siddiqi, Plaintiff stated he had been "stressed out" and that was the reason he had been hospitalized.  He felt "better" on discharge.  Dr. Siddiqi that Plaintiff's affect was still restricted, although Plaintiff said his mood was "fine."  (Tr. 436). Dr. Siddiqi continued Plaintiff on the same medications prescribed during his hospitalization at Twin Valley.  (Tr. 437).  Five weeks later Plaintiff reported to Dr. Siddiqi that he was doing the same, he still heard voices sometimes, he was living on his own, and he felt tired during the daytime.  (Tr. 519).  Dr. Siddiqi noted that Plaintiff's affect was restricted and his mood was frustrated and angry.  *Id.*  He continued Plaintiff's medications.  (Tr. 520).

  In July 2007, after ALJ Shell's administrative hearing but before he issued his non-disability decision, Eileen Buban, Psy.D, answered written Interrogatories.  (Tr. 526-28). Dr. Buban reviewed the medical record and noted the various diagnoses indicated in the record.  She wrote that Plaintiff's "impairment is mild when he complies with his medications and treatment as evidenced by attending college obtaining A's & B's according to record."  (Tr. 526).  Dr. Buban noted that Plaintiff "frequently stops his medication resulting in increased symptoms over a 3 to 4 month time frame."  *Id*.  She added that Plaintiff "experiences paranoia and auditory hallucinations when off medications.  Record indicates that he is medication-noncompliant frequently over the last four years....  The record indicates that when off medications he deteriorates in functioning.  When on medications and treatment he function with minimal problems."

8

(Tr. 528).

Dr. Buban concluded that all "increases in symptoms coincided with stopping meds." *Id*. Dr. Buban concluded that due to his mild paranoia, occasional contact with the public, supervisors, and peers" was indicated. (Tr. 528).

### III. Administrative Review

#### A. "Disability" Defined

To be eligible for benefits under the DIB or SSI programs a claimant must be under a "disability" (among other requirements). *See* 42 U.S.C. §§423(a), (d), 1382c(a).[6] The Social Security Act defines the term "disability" in essentially the same manner under both programs. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant (1) from performing his or her past job, and (2) from engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen*, 476 U.S. at 469-70.

A DIB/SSI applicant bears the ultimate burden of establishing that he or she is under a disability. *See Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see Wyatt v. Secretary of Health and Human Services*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

#### B. ALJ Shell's Decision

ALJ Shell evaluated Plaintiff's DIB and SSI applications and the evidence by using the five-Step sequential evaluation procedure required by Social Security Regulations. *See* Tr. 28-40; *see also* 20 C.F.R. §404.1520(a)(4). His more notable findings occurred at Steps 2 and 4.

---

[6] The remaining citations to the Regulations will identify the pertinent DIB Regulation with full knowledge of the corresponding SSI Regulation.

9

ALJ Shell found at Step 2 that Plaintiff had several severe impairments: "history of gunshot wound to the abdomen, schizoaffective disorder, schizophrenia – paranoid type, bipolar affective disorder, and intermittent cannabis abuse...." (Tr. 21) (citations omitted).  At Step 4 ALJ Shell assessed Plaintiff's "residual functional capacity"[7] as follows:

> [T]he claimant has the residual functional capacity to perform medium work[8] except that he is limited to a low stress working environment.  A low stress working environment is one that does not involve direct dealing with the public, production quotas, or over the shoulder supervision, which permits the person to work independently of co-workers and supervisors.

(Tr. 34)(footnote added).  The ALJ also concluded that Plaintiff's testimony was not entirely credible; that if Plaintiff complied with his medication regimen, he could perform the above-described limited range of medium work; and that Dr. Buban's opinions were entitled to significant weight while Dr. Siddiqi's opinions were not.  (Tr. 37).

These and other findings throughout the ALJ's sequential evaluation led him to ultimately conclude that Plaintiff was not under a disability and, consequently, not eligible for DIB or SSI.

## IV.   Judicial Review

Judicial review of an ALJ's decision proceeds along two lines: " whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r. of Social Security*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r. of Soc. Sec.*, 478 F3d 742, 745-46 (6th Cir. 2007).

---

[7] Although obscure outside the social security context, the phrase "residual functional capacity" is an assessment of a claimant's physical and mental abilities or what the individual can or cannot do despite his or her limitations.  *See* 20 C.F.R. §404.1545(a)(1); *see also Howard v. Commissioner of Social Sec.*, 276 F.3d 235, 239 (6th Cir. 2002).

[8] "Medium work" involves "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds...." 20 C.F.R. §404.1567(c).

Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Rogers v. Comm'r. of Social Security*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Social Security*, 375 F.3d 387, 390 (6th Cir. 2004). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance..." *Rogers*, 486 F.3d at 241.

The second line of judicial inquiry – reviewing the ALJ's legal criteria for correctness – might result in reversal despite the presence of substantial supporting evidence. *Rabbers v. Comm'r. of Social Security*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the [Social Security Administration] fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746 and citing *Wilson v. Comm'r. of Social Security*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

**V.     Discussion**

    **A.     The Parties' Contentions**

Plaintiff contends that the ALJ failed to follow the applicable Regulations and Social Security Ruling 92-59 when analyzing whether Plaintiff's failure to follow prescribed treatment rendered him ineligible for DIB or SSI. Plaintiff further contends that this error also fatally flawed the ALJ's evaluation of treating psychiatrist Dr. Siddiqi's opinions.

The Commissioner raises several main arguments: (1) The record, including

Plaintiff's medical records, fails to support Plaintiff's asserted reasons for not taking medication; (2) the evidence shows that every one of Plaintiff's hospitalizations was characterized by his dramatic improvement when taking medication, "and the remaining evidence showed an ability to function when on medication as well as his understanding that medication was necessary for functioning" (Doc. #13 at 80); (3) the ALJ properly evaluated Dr. Siddiqi's opinion, which "was inconsistent with the information in his own treatment notes, which reflect that Plaintiff was doing relatively well when compliant with medication; and (4) the ALJ properly considered Plaintiff's severe mental impairment in his Residual Functional Capacity by limiting Plaintiff to jobs involving no direct dealing with the public, no production quotas, no over-the-shoulder supervision, and work activities independent of co-workers and supervisors.

### B. The ALJ's Emphasis On Plaintiff's Noncompliance With Treatment

When considering Plaintiff's noncompliance with his medication regiment, the ALJ wrote:

> 20 CFR 404.1530 and 416.930 provides that a person will not be found disabled if he does not follow prescribed treatment without a good reason and lists several reasons considered to be good cause for failure to follow prescribed treatment. The claimant's unilateral stopping or non-compliance with medication does not fall within the enumerated examples of good cause. SSR [Social Security Ruling] 82-59 also provides that an individual who would otherwise be found to be under a disability, but who fails without justifiable cause to follow treatment prescribed by a treating source, and that treatment can be expected to restore the individual's ability to work cannot, by virtue of such failure, be found to be under a disability. In this case, it is clear that the claimant's symptoms decrease and his functional capacity increase significantly when he is complying with his medication and treatment regimen. As reported by Dr. Buban, house [sic, presumably "whose"] opinion is well-supported by the weight of the evidence, the claimant's symptoms increase when he is not compliant with treatment. He has experienced exacerbations of symptoms, but this is consistently due to his non-compliance with prescribed treatment. The documented improvement in the claimant's condition when he is following

12

>the prescribed regiment of his treating physician confirms that treatment is successful in restoring his functional capacity. He is able to attend school, relate at least superficially to others, sustain the attention, concentration, persistence, and pace necessary to perform detailed and some complex tasks when compliant with medication.

(Tr. 33).

The ALJ placed significant weight on Dr. Buban's opinion, finding it "well-supported by the weight of the entire record." (Tr. 37). The ALJ found, in significant part, "Dr. Buban correctly explained that the claimant's episodes of reported increased symptoms are directly related to a failure to comply with prescribed treatment. That opinion is supported by the treatment and hospital records in evidence and is no[t] contradicted by any credible evidence." *Id*.

The ALJ declined to place significant weight on Dr. Siddiqi's opinion, explaining:

>there is no mention of the claimant's well-documented favorable response to treatment or his repeated episodes of treatment non-compliance. This undermines the integrity of Dr. Siddiqi's opinion and renders it less credible. While the claimant may experience significant symptoms when he does not comply with treatment, there is no mention of any improvement by Dr. Siddiqi, which seems strange given the information contained in his treatment notes and the records from other treating sources. As a result, Dr. Siddiqi's opinion is not entitled to significant adjudicative weight as it does not portray a true picture of the claimant's functional capacity when he is compliant with prescribed treatment as required by the regulations.

(Tr. 37).

### C. <u>Analysis</u>

Social Security Regulations requires claimants to follow the treatment prescribed by his or her physician "if this treatment can restore [the claimant's] ability to work." 20 C.F.R. §404.1530(a). If the claimant fails to follow the prescribed treatment "without a good reason," he or she will not be found to be under a disability. 20 C.F.R. §404.1530(b).

"For some mental disorders, the very failure to seek treatment is simply another

13

symptom of the disorder itself." *White v. Commissioner of Soc. Sec.*, 572 F.3d 272, 283 (6th Cir. 2009)(citing *Pate-Fires v. Astrue*, 564 F.3d 935, 945 (8th Cir. 2009)). "[F]ederal courts have recognized that a mentally ill person's noncompliance with psychiatric medications can be, and usually is, the 'result of [the] mental impairment [itself] and, therefore, neither willful nor without justifiable excuse.'" *Pates-Fires*, 564 F.3d at 945 (brackets in original)(quoting in part *Mendez v. Chater*, 943 F.Supp. 503, 508 (E.D. Pa. 1996))(other citations omitted).

      The ALJ erred in Plaintiff's case by not addressing whether his periodic noncompliance with his prescription-medication regimen manifested from of his severe mental impairments including, in part, schizophrenia or schizoaffective disorder. *See Pates-Fires*, 564 F.3d at 945; *see also White*, 572 F.3d at 283; *Blankenship v. Bowen*, 874 F.2d 1116, 1124 (6th Cir. 1989)("Appellant may have failed to seek psychiatric treatment for his mental condition, but it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation."). Indeed, the ALJ's decision simply overlooked or ignored whether Plaintiff's severe mental impairments, schizophrenia or schizoaffective disorder, contributed to or caused his noncompliance with prescribed treatment. The ALJ merely concluded that Plaintiff's reason for failing to follow prescribed treatment "does not fall within the enumerated examples of good cause." (Tr. 32).

      Further, Social Security's Ruling 82-59 explains the ALJ's obligations when a claimant is not following prescribed treatment:

> Where the treating source has prescribed treatment clearly expected to restore ability to engage in any SGA [Substantial Gainful Activity] (or gainful activity, as appropriate, but the disabled individual is not undergoing such treatment, appropriate development must be made to resolve whether the claimant ... is justifiably failing to undergo the treatment prescribed.
>
> *Development With the Claimant or Beneficiary* – The claimant ... should be given an opportunity to fully express the specific reason(s) for not

14

> following the prescribed treatment. Detailed questioning may be needed to identify and clarify the essential factors of refusal.
>
> The record must reflect as clearly and accurately as possible the claimant's ... reason(s) for failing to follow the prescribed treatment.
>
> Individuals should be asked to describe whether they understand the nature of the treatment and the probable course of the medical condition (prognosis) with and without the treatment prescribed. The individuals should be encouraged to express in their own words why the recommended treatment has not been followed. They should be made aware that the information supplied will be used in deciding the disability claim and that, because of the requirements of the law, continued failure to follow prescribed treatment without good reason can result in denial or termination of benefits.

Social Security Ruling 82-59, 1982 WL 31384 at *794-95 (italics in original).

During the administrative hearing, the ALJ did not directly ask Plaintiff why he did not take his medications consistently or as prescribed. The record, moreover, documents that Plaintiff repeatedly reported medication side effects such as tremor (Tr. 322) and sluggishness (Tr. 418, 420). At other times, Plaintiff reported that his medications were not helping him. (Tr. 404). When Plaintiff stopped taking Depakote in 2006, he did so because he did not think he really needed it (Tr. 372) – even though he was stressed out after friends kicked him out of his living arrangement. (Tr. 371). In December 2006 Plaintiff stopped taking Seroquel because it made him hungry and angry and caused negative thoughts. (Tr. 453). In light of such information, the ALJ should have questioned Plaintiff in more detail with the goal of identifying and clarifying "the essential factors of refusal." SSR 82-59, 1982 WL 31384 at *794. Without such questioning, the record – and in turn, the ALJ's Decision – fails to "reflect as clearly and accurately as possible the claimant's ... reason(s) for failing to follow the prescribed treatment" as required by Ruling 82-59. *Id*. at *795.

In addition, it is not clear whether the prescribed treatment would actually restore Plaintiff's ability to perform substantial gainful activity. For example, even when

Plaintiff was first evaluated outside institutional care in February 2004, he continued to report auditory hallucinations along with some persecutory ideation, social withdrawal, and racing thoughts. (Tr. 326). On mental status examination, Dr. Bienenfeld observed that Plaintiff was withdrawn, preoccupied, and slow. (Tr. 326). There was no suggestion then that Plaintiff had not complied with his medication regimen and Dr. Bienenfeld continued his medications. (Tr. 328).

There was no indication in or near August 2004 that Plaintiff was failing to take his medication as prescribed, yet his psychiatrist observed that Plaintiff was worse, and he was hostile. Plaintiff reported racing thoughts, his mood was depressed. and his affect was blunted. His thoughts were disorganized. (Tr. 412). In 2005, after Plaintiff resumed taking his medications regularly, he continued to experience mood swings, anxiety, and paranoia. (Tr. 399). At that time, Dr. Siddiqi prescribed Depakote, along with other medications. (Tr. 400). Yet Plaintiff continued to report he was stressed by people and felt that they were after him. Dr. Siddiqi noted that Plaintiff's mood was volatile and his affect was labile and paranoid. (Tr. 397). Even when Plaintiff was hospitalized in January 2007 and stabilized on medications, he exhibited paranoia about his medications, requesting frequently that they be changed. (Tr. 465). Further, while Plaintiff denied auditory hallucinations throughout the hospital stay, "staff members noted that at times he appeared to be aloof and guarded and somewhat in his own world when nobody else was there." (Tr. 465).

In addition, the ALJ's emphasis on Plaintiff's noncompliance was based heavily on Dr. Buban's interrogatory answers. Dr. Buban repeatedly stated in her answers that Plaintiff was often medication noncompliant and when he complied with his medication regimen, his functioning improved rapidly *See* Tr. 32-37, 526-28. Dr. Buban, however, did not specifically address the key issue: whether Plaintiff's noncompliance with his prescribed-medication regimen manifested from his severe mental impairments. Her opinions, therefore, do not render harmless the ALJ's error in overlooking or ignoring this

16

key issue.

Lastly, although the Commissioner raises numerous arguments, as indicated above, *supra*, §V(A), none of those arguments directly addresses the ALJ's failure to determine whether Plaintiff's periodic noncompliance with his prescribed treatment/medication regimen manifested from one or more of his severe mental impairments, such as schizophrenia or schizoaffective disorder.

Accordingly, Plaintiff's challenges to the ALJ's Decision are well taken.

## VI.     **Remand Is Warranted**

If the ALJ failed to apply the correct legal standards or his factual conclusions are not supported by substantial evidence, the Court must decide whether to remand the case for rehearing or to reverse and order an award of benefits. Under sentence four of 42 U.S.C. §405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Remand is appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994).

Plaintiff seeks a remand for payment of benefits. Yet, such a remand is unwarranted because the evidence of disability is not overwhelming and because the evidence of a disability is not strong while contrary evidence is weak. *See Faucher*, 17 F.3d at 176.

Plaintiff, however, is entitled to an Order remanding this case to the Social Security Administration pursuant to Sentence Four of §405(g) because due to problems set forth above and because at least one critical issue has not yet been administratively addressed and resolved: whether Plaintiff's periodic noncompliance with his prescribed treatment/medication regimen manifested from one or more of his severe mental impairments, such as schizophrenia or schizoaffective disorder. On remand the ALJ

should be directed to (1) address and resolve this issue as required by the Commissioner's Regulations and Rulings and by case law; (2) evaluate Plaintiff's credibility and the medical source opinions of record under the legal criteria applicable under the Commissioner's Regulations and Rulings and as mandated by case law; and (3) review the evidence under the required five-step sequential evaluation procedure to determine anew whether Plaintiff was under a disability and thus eligible for DIB and/or SSI.

## IT IS THEREFORE RECOMMENDED THAT:

1. The Commissioner's non-disability finding be vacated;

2. No finding be made as to whether Plaintiff Erik Franklin was under a "disability" within the meaning of the Social Security Act;

3. This case be remanded to the Commissioner and the Administrative Law Judge under Sentence Four of 42 U.S.C. §405(g) for further consideration consistent with this Report; and

4. The case be terminated on the docket of this Court.


June 10, 2010

                                                    s/Sharon L. Ovington
                                                      Sharon L. Ovington
                                           United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).